IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 2, 2023 Session

**ROBIN L. DUFFER V. MARC N. DUFFER**

**Appeal from the Chancery Court for Rutherford County**
**No. 18CV-739      Bonita Jo Atwood, Judge**

---

**No. M2021-00923-COA-R3-CV**

---

After seven years of marriage, a wife filed a complaint for divorce against her husband. The primary issues before the trial court pertained to the classification of the marital residence and custody of the parties' child. After a hearing on those issues, the trial court determined that the marital residence had once been the husband's separate property but had transmuted into marital property. The court then ordered the property sold and the proceeds distributed equally between the parties. Regarding custody, the court designated the wife as primary residential parent and severely restricted the husband's parenting time. Discerning that the trial court erred in its valuation of the marital residence, we modify the court's order to reflect the amount submitted by the husband. We affirm the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Robbie T. Beal and Shannon L. Crutcher, Brentwood, Tennessee, for the appellant, Marc N. Duffer.

Gilbert Wayne McCarter, II, and Anthony James Cain, Murfreesboro, Tennessee, for the appellee, Robin L. Duffer.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from the dissolution of the marriage of Robin L. Duffer ("Wife") and Marc N. Duffer ("Husband"). The parties married on May 28, 2011, and one child

was born of the marriage. Four years before the marriage, Husband purchased an unimproved lot located at 2727 Crowne Pointe Drive, Murfreesboro, Tennessee ("Crowne Pointe"), and he built a home on the lot that same year. Upon completion of construction, Husband, Wife, and Wife's two daughters from a previous relationship moved into the home. Crowne Pointe served as the parties' marital residence from 2011 until 2018.

On May 7, 2018, after approximately seven years of marriage, Wife filed a complaint for divorce. She then filed a motion for pendente lite relief on May 16, 2018, seeking exclusive possession of the marital residence and entry of a temporary parenting plan. Thereafter, Wife filed a petition for an order of protection alleging that Husband had engaged in inappropriate and disturbing behavior, such as stalking her by placing GPS tracking devices in her vehicle and committing several instances of verbal and physical abuse. Based on these allegations, the trial court entered an ex parte order of protection against Husband. The parties filed an agreed order for pendente lite relief on September 14, 2018, that included a temporary parenting plan. Despite the allegations of abuse against Husband, the parties agreed that the temporary parenting plan would allow them both equal parenting time with the child.

Following entry of the agreed order for pendente lite relief, not much of significance occurred in the case until October 18, 2019, when Wife filed a motion to modify the agreed temporary parenting plan. She alleged that she had discovered a cell phone in the child's backpack that contained numerous inappropriate and disturbing photographs, screenshots, and text messages. She further alleged that Husband's interactions with the child had become increasingly disturbing and inappropriate, particularly because he had taken nude photographs and videos of the child. This issue was heard by a special master on October 28, 2019. Wife testified that "over 80 nude pictures" of the child were found on the cell phone. When asked about the number of nude photographs, Husband stated that he thought taking so many nude photographs of the child was "normal parental behavior." Because the cell phone was in the possession of the Murfreesboro Police Department[1] at the time of the hearing, the only available evidence of nude photographs was a picture of the child that Husband had posted to Instagram. In the photograph, the child was approximately seven years old and was standing naked in front of a Christmas tree.

The special master entered a report with findings of fact and conclusions of law on November 4, 2019. In the report, the special master stated that he "d[id] not agree with [Husband's]" belief that taking so many nude photographs of the child was "normal parental behavior" and designated Wife as the primary residential parent. The special master went on to conclude that Husband's parenting time should be reduced to "every other weekend during the day on Saturday and Sunday from 9:00 AM until 4:00 PM." After the trial court adopted the special master's report on November 26, 2019, Husband

---

[1] After investigating the photographs on the cell phone, the police department did not pursue any criminal charges against Husband.

filed a motion requesting that the trial be continued so Husband could submit to a forensic psychological evaluation with Dr. B. Charles Ihrig. The court entered an order on January 22, 2020, granting the request for a continuance, declaring the parties divorced, and reserving all other matters for trial.

Husband submitted to the forensic psychological evaluation with Dr. Ihrig on December 11, 2019. The evaluation consisted of the following psychological tests: (1) the Multiphasic Sexual Inventory II ("MSI II"), (2) the Minnesota Multiphasic Personality Inventory 2nd Edition ("MMPI-2"), and (3) the Child Abuse Potential Inventory ("CAP"). In addition to administering these tests to Husband, Dr. Ihrig conducted interviews with Husband and collateral sources. Based on the evaluation's results, Dr. Ihrig concluded that there was no evidence in Husband's history indicating that he suffered from any sexual deviance or that he posed a risk of sexual offense.

Relying on Dr. Ihrig's findings, Husband filed a motion to modify the temporary parenting plan to increase his parenting time with the child. The special master conducted a hearing on Husband's motion on September 28, 2020. Dr. Ihrig testified that he reviewed all of the 82,301 photographs on the cell phone found in the child's backpack, and he identified 27 containing an image of the child nude or partially nude. Although Dr. Ihrig believed that Husband exercised "some bad judgment" in taking some of the photographs, Dr. Ihrig opined that Husband exhibited no sexual deviance or inappropriate interest in the child. The special master accepted Dr. Ihrig's opinion and entered an order modifying the temporary parenting plan to allow Husband parenting time "every other weekend from Thursday after school until Monday return of school" and from Wednesday after school until 7:00 p.m. that evening during the weeks Husband did not have weekend parenting time.

Prior to trial for the remaining divorce issues, the trial court appointed Dr. Ihrig to conduct a parenting evaluation of the parties. As part of this evaluation, Dr. Ihrig conducted an evaluation of Wife, interviewed the child, consulted with several collateral sources, and conducted visits of Wife's and Husband's homes. Based on the results of this evaluation, Dr. Ihrig opined that there had been an unacceptable amount of communication by both parties with the child about the case. Nevertheless, Dr. Ihrig concluded that there had been no parental alienation by either party, and he believed that Husband should be allowed substantial parenting time with the child.

The trial court heard the remaining divorce issues over the course of three days in May 2021 and entered the final judgment of divorce on July 16, 2021. As relevant to this appeal, the trial court concluded that the parties' marital residence had once been Husband's separate property but had transmuted to become marital property. The court found that the value of the marital residence was $602,450—the average of the value determined in a retrospective appraisal submitted by Husband that the home was worth $565,000 and Wife's testimony that the home was worth $639,900. The court ordered that

the marital residence be sold and that the proceeds be divided equally between the parties. In regard to custody, the court designated Wife as the primary residential parent and determined that supervised visitation was appropriate for Husband. The court ordered Husband to complete twenty-six weeks of therapeutic supervised visitation with the child that would consist of no less than two but no more than eight hours per week. At the conclusion of the twenty-six weeks, Husband's parenting time would be from Thursday at 6:00 p.m. until Sunday at 6:00 p.m. every other week, alternating holidays, and two weeks during the summer—a total of ninety days of parenting time each year. Lastly, the court awarded Wife sole decision-making authority.

Husband appeals and presents several issues that we consolidate and restate as follows: whether the trial court abused its discretion in classifying and valuing the marital residence, and whether the trial court abused its discretion in ordering a restricted parenting schedule for Husband.

STANDARD OF REVIEW

This case comes before us after a bench trial. Thus, we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Trezevant v. Trezevant*, 568 S.W.3d 595, 606 (Tenn. Ct. App. 2018). "[B]ecause the trial court has the opportunity to observe the demeanor of the witnesses and hear the in-court testimony, we afford considerable deference to the trial court's credibility determinations and the weight given to oral testimony." *Id.* (citing *Andrews v. Andrews*, 344 S.W.3d 321, 339 (Tenn. Ct. App. 2010)). We review a trial court's conclusions on issues of law de novo without a presumption of correctness. *Hyneman v. Hyneman*, 152 S.W.3d 549, 553 (Tenn. Ct. App. 2003).

ANALYSIS

I. The marital residence

    A. Classification

Husband first argues that the trial court incorrectly classified Crowne Pointe as marital property. He contends that he purchased the property before the marriage, so it should have been classified as his separate property. For the reasons discussed below, we respectfully disagree.

The Tennessee Supreme Court has explained that, in divorce cases, the classification of the parties' property is essential to an equitable division of property:

> Tennessee is a "dual property" state because its domestic relations law recognizes both "marital property" and "separate property." *See generally*

- 4 -

Tenn. Code Ann. § 36-4-121; *Eldridge v. Eldridge*, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002). When a married couple seeks a divorce, the "marital property" must be divided equitably between them, without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1). "Separate property" is not part of the marital estate and is therefore not subject to division. *See Cutsinger [v. Cutsinger]*, 917 S.W.2d [238,] 241 [Tenn. Ct. App. 1995]. Thus, it is imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished.

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009).

What do the terms "separate property" and "marital property" mean? Generally speaking, "separate property" is "[a]ll real and personal property owned by a spouse before marriage," Tenn. Code Ann. § 36-4-121(b)(4)(A), whereas "marital property" "means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . ." Tenn. Code Ann. § 36-4-121(b)(2)(A).

Depending on how the parties treat the property, "separate property can become marital property either through the doctrine of commingling or through the doctrine of transmutation." *Hayes v. Hayes*, No. W2010-02015-COA-R3-CV, 2012 WL 4936282, at *11 (Tenn. Ct. App. Oct. 18, 2012) (citing *Eldridge v. Eldridge*, 137 S.W.3d 1, 13 (Tenn. Ct. App. 2002)). Our Supreme Court has explained these doctrines as follows:

> "[S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate."

*Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002) (quoting 2 Homer H. Clark, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 16.2 at 185 (2d ed. 1987)).

We have previously identified some of the common factors courts consider when determining whether real property has transmuted from separate property to marital property:

> Four of the most common factors courts use to determine whether real property has been transmuted from separate property to marital property are: (1) the use of the property as a marital residence; (2) the ongoing maintenance and management of the property by both parties; (3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property. Accordingly, our court has classified separately owned real property as marital property when the parties agreed that it should be owned jointly even though the title was never changed, or when the spouse owning the separate property conceded that he or she intended that the separate property would be converted to marital property.

*Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006) (citations omitted). These four factors are the most common, but they are not exclusive. "Tennessee courts have also found persuasive the use of marital funds for improving the property or paying off an encumbrance." *Lewis v. Lewis*, No. W2019-00542-COA-R3-CV, 2020 WL 4668091, at *4 (Tenn. Ct. App. Aug. 11, 2020) (citing *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007)). Notably, "a spouse's earnings are marital property, regardless of whether they are deposited into a joint or separate bank account." *Id.* (citing *Wade v. Wade*, 897 S.W.2d 702, 716 (Tenn. Ct. App. 1994)). "Whether or not transmutation has occurred is a fact question." *Luplow v. Luplow*, 450 S.W.3d 105, 114 (Tenn. Ct. App. 2014) (citing *Fox*, 2006 WL 2535407, at *3).

Relying on several of the foregoing factors, the trial court found that the marital residence was Husband's separate property at the time of the parties' marriage, but it became marital property through the doctrine of transmutation, stating as follows:

> The separate property became marital property by virtue of transmutation based on the evidence that the parties intended for it to be marital property, both parties contributed to the ongoing maintenance and management of the property, and the credit of the non-owner spouse was used to improve the property; thereby, treating the property as the marital residence. . . . The Court finds there is no dispute that the parties used the property throughout the marriage as their marital residence.

We begin our assessment of the evidence with Husband's testimony that he used premarital funds to make the down payment for Crowne Pointe and obtained a mortgage for the remainder of the balance of the purchase price. Initially, Husband purchased the property with the intent to build a spec home to sell. After the home was built, however, the parties decided to move into the home, and the property was their marital residence

from the date of the marriage in 2011 until Wife moved out in 2018. Thus, the trial court correctly found that the first factor applies in this case because the parties used Crowne Pointe as a marital residence.

Regarding maintenance of the property, Wife testified that, as a homemaker, she made non-financial contributions such as the cleaning the house. Husband also made non-financial contributions to the upkeep of the property by painting and landscaping. Both parties testified that they earned wages during the marriage that were used to pay the mortgage and other home expenses. We, therefore, agree with the trial court's finding that this transmutation factor applies.

The trial court found that the third transmutation factor, whether the title to the property was placed in joint ownership, did not apply. The evidence supports this finding. Specifically, Husband testified that Wife's name was never placed on the title to Crowne Pointe, and Wife did not dispute this testimony.

The trial court also found that the fourth transmutation factor, whether the credit of the non-owner spouse was used to improve the property, applied. The evidence shows that, in 2015, the parties jointly obtained a home equity line of credit ("HELOC") on the marital residence and that the funds were used for marital purposes. The record contains no evidence, however, that any HELOC funds were used to improve the property. This Court has held that this factor did not apply in a situation where the evidence showed that a couple used a marital residence to secure a debt but nothing established that any funds associated with the debt were used to improve the property. *Luplow*, 450 S.W.3d at 114-15; *but cf. Hayes*, 2012 WL 4936282, at *12 (finding transmutation occurred where "[b]oth parties borrowed monies from the equity in the home," but there was no evidence funds were used to improve the property). Thus, we disagree with the trial court's reliance on this factor. We find it persuasive, however, that the record shows that marital funds were used to pay off an encumbrance—the mortgage on Crowne Pointe. *See Lewis*, 2020 WL 4668091, at *4.

In sum, the record supports the trial court's finding that Crowne Pointe transmuted to marital property.[2]

---

[2] In the final sentence of his argument on this issue, Husband asserts that he should be allowed to keep the marital residence "and purchase Wife's interest therein" rather than the court ordering that the property be sold. He failed to include this as an issue in the "Statement of the Issues" section of his appellate brief, and he failed either to set forth an argument or to cite to any legal authority for this issue. Therefore, the issue is waived. *See City of Memphis v. Edwards by & Through Edwards*, --- S.W.3d ---, No. W2022-00087-SC-R11-CV, 2023 WL 4414598, at *2 (Tenn. July 5, 2023) (emphasizing that "an issue must be presented in the manner prescribed by [Tenn. R. App. P. 27] . . . and may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Rule 27(a)(4)").

B. Valuation

Husband's next challenges the trial court's valuation of the marital residence. At trial, Husband offered the testimony of Todd Paris, a licensed real estate appraiser. Mr. Paris conducted an appraisal of Crowne Pointe and, as of February 12, 2020, he valued the property at $565,000. Wife submitted no evidence concerning the value of the marital residence as of the date the parties were declared divorced. Rather, she testified that, as of the final hearing, the value of the property was worth $639,900. The trial court found that the value of the marital residence was an average of the two values submitted by Husband and Wife, $602,450.

"'Once property has been classified as marital property, the court should place a reasonable value on property that is subject to division.'" *Trezevant*, 568 S.W.3d at 606 (quoting *Luplow*, 450 S.W.3d at 109). "[E]ach party bears the burden of bringing forth competent evidence," and "[i]f the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence." *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). Because a trial court's valuation of a marital asset presents a question of fact, "we presume the trial judge's factual determinations are correct unless the evidence preponderates against them." *Id.*

Husband asserts, and Wife concedes, that the trial court erred in relying on Wife's valuation evidence to establish the valuation for the martial residence because that evidence was not "as near as reasonably possible" to the date the parties were declared divorced. When Wife filed the petition for divorce in 2018, the statute governing the division of marital property required that the property be "valued as of a date as near as reasonably possible to the final divorce hearing date." Tenn. Code Ann. § 36-4-121(b)(1)(A) (2017). This Court has construed the phrase "final divorce hearing date" and held that "the appropriate date for valuing the parties' property is the date a decree is entered declaring the parties divorced." *Dunlap v. Dunlap*, 996 S.W.2d 803, 817 (Tenn. Ct. App. 1998); *see also Preston v. Preston*, No. 03A01-9406-CV-00202, 1995 WL 10345, at *7 (Tenn. Ct. App. Jan. 11, 1995).

In the present case, the trial court entered a decree declaring the parties divorced on January 22, 2020. Thus, the marital residence should have been valued as near as possible to that date. The written appraisal submitted by Husband established the value of the property as of February 12, 2020, which was within a few weeks of the court declaring the parties divorced. Wife, on the other hand, only submitted evidence establishing the value of the property as of the date of the final hearing on the property distribution and child custody issues, which was nearly a year and a half after the court declared the parties divorced. Thus, the only competent evidence of the property's value reasonably near the date the parties were declared divorced was Husband's valuation of $565,000. We, therefore, conclude that the trial court's order should be amended to provide that the marital residence was valued at $565,000.

II. Restricted parenting schedule

Husband's remaining arguments pertain to the trial court's decision to restrict his parenting time with the parties' child by limiting him to supervised visitation for six months. When allocating parental responsibilities, "[t]he overriding goal of a trial court is to approve a parenting plan that promotes the best interests and welfare of the child, regardless of the parents' interests in the resulting parenting arrangement." *Malmquist v. Malmquist*, No. W2007-02373-COA-R3-CV, 2011 WL 1087206, at *17 (Tenn. Ct. App. Mar. 25, 2011) (citing *Burden v. Burden*, 250 S.W.3d 899, 909 (Tenn. Ct. App. 2007)). "'No hard and fast rules exist for determining which [parenting] arrangement will best serve a child's needs; inquiry is factually driven and requires courts to carefully weigh numerous considerations.'" *Id.* (quoting *Hogue v. Hogue*, 147 S.W.3d 245, 251 (Tenn. Ct. App. 2004)). Generally, the courts of this state "favor the right of the alternative residential parent to reasonable parenting time," but a court "may limit or eliminate a parent's unsupervised parenting time if there is definite evidence to show the exercise of that right would jeopardize the child." *Id.* (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). When limiting parent-child interactions, courts usually order "the least restrictive limitations . . . as [are] possible and consistent with the child's best interest." *In re S.C.H.*, No. M2003-01382-COA-R3-CV, 2004 WL 2941151, at *5 (Tenn. Ct. App. Dec. 20, 2004) (citing *Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at *11 (Tenn. Ct. App. Mar. 7, 2001)).

Our Supreme Court has held that appellate review of a trial court's parenting plan decisions is as follows:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99,

105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). Despite the deference required by this review standard, the broad discretion afforded to the trial court "is not unbounded." *Malmquist*, 2011 WL 1087206, at *18 (citing *Hogue*, 147 S.W.3d at 251). The trial court's decision must be based upon proof, and the court must "apply the appropriate legal principles" when making its decision. *Id.*

A. Dr. Ihrig

Husband asserts that, when determining that his parenting time should be restricted, the trial court abused its discretion "in completely disregarding any of Dr. Ihrig's recommendations" that Husband should be awarded substantial parenting time with the child. In particular, Husband disagrees with the following: (1) the trial court's assessment "that it had numerous concerns with Dr. Ihrig's clinical analysis, which included numerous oversights and errors in his report," and (2) the trial court's finding that Dr. Ihrig exhibited a bias in favor of Husband.

It is well-settled that "[t]he trial judge, as the trier of fact, is not compelled to unequivocally accept expert opinions." *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 233 (Tenn. Ct. App. 2009) (citing *Davis v. Sliney*, 1988 WL 75331, at *5 (Tenn. Ct. App. July 21, 1988)). A trier of fact is not required to accept an expert witness's opinion as true and "'may reject it, if it finds that it is inconsistent with the facts in the case or otherwise unreasonable.'" *Dickey v. McCord*, 63 S.W.3d 714, 720 (Tenn. Ct. App. 2001) (quoting *Gibson v. Ferguson*, 562 S.W.2d 188, 190 (Tenn. 1976)). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Forrest Constr.*, 337 S.W.3d at 233. Even when no opposing expert testimony is presented, "'the trier of facts is still bound to decide the issue upon its own fair judgment, assisted by the expert testimony.'" *Dickey*, 63 S.W.3d at 720 (quoting *Gibson*, 562 S.W.2d at 190).

The record in this case supports the trial court's findings regarding Dr. Ihrig and shows that the court exercised its own fair judgment in reaching its decision. As Wife points out in her brief, the record shows that Dr. Ihrig committed the following oversights and errors while conducting his analysis:

- In his written "Report on the examination of photos retrieved from [Husband's] cell phone," Dr. Ihrig noted that there were four thousand nine (4009) videos contained on the phone, but due to the "RAM

capacity" of his computer, he only reviewed the thumbnails of said videos. . . . Nevertheless, . . . Dr. Ihrig found that "[o]nly one video appears to have contained [the child] urinating outdoors." . . .

- Even though Wife's counsel notified Dr. Ihrig . . . that Husband had undergone prior psychological testing, Dr. Ihrig admitted in his testimony that he failed to include the results in his report and that he later "stumbled across it going back through emails."

- In the conclusion of his written psycho-sexual evaluation of Husband, Dr. Ihrig stated that "[a]t the time of this evaluation, only one of the images in question had been shown to this evaluator and included an image of he and his son in the bathroom when he was shaving and they were both wearing towels." . . . In his trial testimony, Dr. Ihrig stated that he had seen "[a] few, I think, maybe three" of the questionable photos at the time of Husband's assessment. . . . He subsequently testified that he had actually seen only one (1) photo but had read "a description of a couple of others." . . . When asked why he didn't include information about the descriptions of the other photos in the report, he replied that it "may have been an oversight." . . .

- In his written psychological examination of Husband, Dr. Ihrig reported that Husband received a Random Response Score of 7 (cutoff of 6) on the Child Abuse Potential Inventory. Regarding this score, Dr. Ihrig testified that "[i]t does look like in this report that we did go over on the random response. There was some internal inconsistencies within that, so I would maybe recharacterize what I wrote on here as there may have been some concern, but it wasn't from a misleading approach; it was from a kind of careless approach."

- At trial, Dr. Ihrig was presented with a photo (sourced from the same phone as all the others) that depicted the minor child viewing a printed nude photo of himself. . . . Dr. Ihrig testified that he did not recall having seen the photo. . . . When asked whether the trial court should be concerned about his testimony given this oversight, Dr. Ihrig confirmed that counsel was "bringing up a very legitimate concern."

The record also contains evidence supporting the trial court's finding that Dr. Ihrig exhibited a bias in favor of Husband. First, although Husband repeatedly refers to Dr. Ihrig as a "court appointed expert," Dr. Ihrig testified that he became involved with the case as a personally retained expert because Husband hired him to alleviate Wife's concerns that Husband had any prurient interest in the child. And, when Dr. Ihrig later conducted the court-ordered custodial evaluation, the parties agreed, at least initially, that Husband would be responsible for paying Dr. Ihrig's fees related to the evaluation.

Second, although Husband claims that Dr. Ihrig administered "objective tests" and made "objective findings" from the results of those tests, the record shows otherwise. Dr. Ihrig administered the CAP test to both parties, and this test generated scores that could be compared in an objective manner. Specifically, it included a "Lie Scale Score" that had a cutoff score of seven. Both parties received a "Lie Scale Score" of six. Dr. Ihrig, however, failed to make objective findings based on these scores. He concluded that Husband's score "indicate[d] a mostly honest approach to the test; thus, the results should be considered valid." He concluded that Wife's identical score "indicate[d] that she was not honest in her approach to this test," and he proclaimed that Wife "engaged in active efforts at dissimulation to a degree that invalidates any further interpretation." When asked about this discrepancy in his conclusions, Dr. Ihrig stated that he was "actually struggling with this a little bit" and that "unfortunately, [he] did not use the correct follow-up on honesty there in that description." He then stated that he would "now give them a tie."

Dr. Ihrig also administered the MMPI-2 to both parties. Unlike the CAP test, this test did not generate actual scores that could be "objectively" compared. Rather, the results were based on Dr. Ihrig's interpretations of the parties' responses to various questions, and his interpretations reflected a bias in favor of Husband. In the "Profile Validity" section of the test results, Dr. Ihrig found that both parties were "defensive" and were likely to "underestimate problems." Nonetheless, Dr. Ihrig's conclusions and recommendations for the parties differed. He concluded that Wife "was guarded in objective assessment to a degree that resulted in little useful data." As for Husband, however, Dr. Ihrig concluded that "[h]e was defensive on much of the testing but not in a manner that invalidated any of the test data." Dr. Ihrig even went so far as to seemingly attempt to excuse Husband's defensiveness as "appear[ing] rather consistent with individual[s] involved in custody situations." He made no attempt to excuse Wife's defensiveness despite her also being involved in a custody situation.

In light of the foregoing, we conclude that the evidence supports the trial court's findings regarding Dr. Ihrig. Therefore, Husband's arguments that the trial court abused its discretion in disregarding Dr. Ihrig's recommendations are unavailing.[3]

---

[3] Additionally, Husband contends that "the trial court abused its discretion in not giving appropriate weight to the objective findings" of Dr. Ihrig. Without any citation to the record, Husband asserts that Dr. Ihrig's report "relied upon specific and accepted testing methods which yield findings that are scaled results not subject to interpretation by the evaluator." We interpret Husband's argument here as being that an expert's objective testing is entitled to greater evidentiary weight even in circumstances where the expert's subjective conclusions are disregarded due to error or bias. Husband cites to no law to support this position, and this Court is aware of none. *See Forrest Constr.*, 337 S.W.3d at 233 ("The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court."). This argument is unconvincing.

B. Clear and definite evidence

In ordering a restricted parenting schedule for Husband, the trial court relied, in part, on Tenn. Code Ann. § 36-6-406(d), which allows a court to "preclude or limit any provisions of a parenting plan" if the court finds any of the following limiting factors exist in the case:

(1) A parent's neglect or substantial nonperformance of parenting responsibilities;
(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;
(3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;
(4) The absence or substantial impairment of emotional ties between the parent and the child;
(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;
(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;
(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or
(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

The trial court found that the fifth limiting factor—abusive use of conflict—existed because Husband "consistently made disparaging remarks to the child concerning his Mother, including calling his mother a clown, cheater, moron, trash, and puppet master and has involved the child in the divorce and custody issues." The court also found that the eighth limiting factor existed, stating:

The Court finds [Husband] has taken nude pictures and videos of the child, printed the pictures and posted pictures and videos of the child on social media. The Court finds [Husband's] behavior is inappropriate, due to the age of the child, and is adverse to the best interest of the child.

After finding that two limiting factors existed, the trial court considered whether supervised parenting time should be ordered pursuant to Tenn. Code Ann. § 36-6-301. That statute provides, in pertinent part:

After making an award of custody, the court shall, upon request of the noncustodial parent, grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship unless the court finds, after a hearing, that visitation is likely to endanger the child's

- 13 -

physical or emotional health. . . . If the court finds that the noncustodial parent has physically or emotionally abused the child, the court may require that visitation be supervised or prohibited until such abuse has ceased or until there is no reasonable likelihood that such abuse will recur. . . .

Tenn. Code Ann. § 36-6-301. The court found that Husband's abusive use of conflict and inappropriate behavior "creat[ed] the danger of damage to the child's psychological development" and was "likely to endanger the child's emotional health." Thus, the court ordered that his parenting time should be supervised for six months so Husband could "improve his parenting skills as to learning boundaries through coaching and modeling and learn how to deal with self-regulation, stress reduction and conflict resolution."

Husband contends that the trial court abused its discretion in its application of Tenn. Code Ann. § 36-6-301 to the facts of this case because the court failed to expressly "acknowledge that the standard of proof required is clear and definite evidence" and failed to expressly "identify[] the actual harm that the child is in jeopardy of suffering." Husband cites to no authority that requires a trial court to expressly reference a "clear and definite evidence" standard or to expressly identify the actual harm a child may suffer, and this Court has found no such authority in thoroughly researching the issue.

In the case of *In re S.C.H.*, this Court stated that, in addition to being able to limit parenting time under Tenn. Code Ann. § 36-6-301, "courts have held that visitation may be limited, or even prohibited, if the court finds there is clear and definite evidence that such visitation would result in harm to the child in a physical, emotional, or moral sense." 2004 WL 2941151, at *5 (citing *Eldridge*, 42 S.W.3d at 85; *Suttles*, 748 S.W.2d at 429; *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998)). Nothing in the *In re S.C.H.* court's opinion, however, requires that a court expressly reference the "clear and definite evidence" standard of proof or expressly identify the specific harm a child may suffer in its order limiting a parent's visitation. And, the cases relied on by the *In re S.C.H.* court to support this proposition contain no such requirement. Those cases merely required that the record contain definite evidence to support the trial court's finding that parenting time should be limited because visitation "'would jeopardize the child, in either a physical or moral sense.'" *Suttles*, 748 S.W.2d at 429 (quoting *Weaver v. Weaver*, 261 S.W.2d 145, 148 (Tenn. Ct. App. 1953)); *see also Eldridge*, 42 S.W.3d at 85, 89 (affirming the trial court's decision not to limit parenting time because the record contained no definite evidence that the child would be harmed physically, emotionally, or morally by visitation with the mother); *Helson*, 989 S.W.2d at 707 (reversing the trial court's limitation on parenting time because the record contained no evidence that the child would be harmed physically, emotionally, or morally as the visitation restriction was "based entirely on the child's wishes").

Here, the record contains definite evidence that the child has been, or would be, subject to emotional harm from unsupervised visits with Husband. Husband took

- 14 -

numerous nude photographs of the child, some of which showed the child engaged in excretory activities like peeing in a swimming pool. With one of the nude photographs, Husband went so far as to enlarge a portion of the photograph containing the child's genitals. Husband printed some of the nude photographs, and he admitted during cross-examination that he had posted at least one nude photograph and one nude video of the child on social media[4] and that those had been viewed several times. He saw nothing wrong with his behavior and testified that he thought taking nude photographs of a six-year-old child was funny.

In addition to taking the nude photographs, Husband often became angry and made disparaging remarks about Mother and the divorce proceedings to the child throughout the pendency of this case. The record supports the trial court's finding that Husband made the following statements to the child:

- "The Courts are wrong, I'm going to make it right."
- "Your Mother does not make the rules."
- "Your Mom will say I did something wrong, your mom cannot co-parent."
- "Stay away from Forky[5] [Wife's paramour]. Don't talk to him. Don't let them brainwash you. They [Wife and her paramour] are morons man. Don't talk about them, they're trash. Kelly [Wife's paramour] isn't your friend, I mean it []. He's not your friend dude. Say what he is . . . he's trash. Make me a promise, he's not your friend, he's not a good dude. Forky's not your damn friend. . . . Never say his name. I'm not going to let them lie to you anymore."
- "You can't ride in the car with your sister, you hear me?"

---

[4] The record indicates that Husband posted the picture and video to his Instagram account. In addition to the concern that Husband posted the picture and video to social media, there was some concern during trial regarding Husband referring to the child as "the Baby Jesus" on the Instagram account. When asked to explain the meaning behind that reference, Husband explained as follows:

> Yeah, that's – that's in reference to an old comedy with Will Farrell. It's called *Talladega Nights*, and it was actually Robin's brother and that first started – [Wife's] brother Jeff. We would always joke around it about –there's a character there that – Ricky Bobby is his name, and he would sit down and at the dinner table and pray, you know, "Dear 6-pound, 8-ounce Baby Jesus." And it was really meant as a total joke.

[5] Wife explained the name "Forky" as follows:

> Forky is a character from the most recent Toy Story movie, *Toy Story 4*. It's an actual toy that a little girl constructed out of trash. It's a spork with a little waxy thing that makes into arms. She's got eyeballs on it. And if you know anything about Toy Story, all the toys come[] to life, and this little particular toy that was made, constructed from trash, refused to be a toy, and it would continue saying things like, "I'm trash, I'm trash," as it would walk around. It would run to the garbage can and try to get in the garbage can. And it was trying not to be a toy; it was trying to be a piece of trash.

- "It's going to be back to 50/50 before you know it. You have to start respecting my wishes."
- "Think about my actions, not hers. I'm very frustrated."
- "You should want to be with me. You should want it more."
- "I'm going to tell you this [referring to his comments that Wife and her paramour are "brainwashers," "not good," and "trash"] over and over on Saturday when I see you."

Wife stated that "[t]here were a lot of times" after Husband made these statements to the child during phone calls that the child would be "upset." Furthermore, when asked about the foregoing statements made by Husband, Dr. Ihrig testified that such conduct amounted to alienation and "emotional abuse that impacts the child."

In light of the foregoing, we conclude that the record contains definite evidence of past and future harm to support the trial court's decision to limit Husband's parenting time.

C. Least restrictive measures

Husband next contends that the trial court abused its discretion in ordering "six months of parenting time limited to between two and eight hours" of supervised visitation per week because that was not "the least restrictive parenting schedule that would adequately address the court's concerns." According to Husband, the court should not have ordered supervised visitation because "his conduct did not rise to the level of the traditional case where supervision is required." To support his contention, Husband relies on two cases where this Court found supervised visitation appropriate: *Pizzillo v. Pizzillo*, 884 S.W.2d 749, 757 (Tenn. Ct. App. 1994) and *Crabtree v. Crabtree*, 716 S.W.2d 923, 927 (Tenn. Ct. App. 1986). These cases involved extreme situations in which the noncustodial parent allegedly sexually abused the child. *See Pizzillo*, 884 S.W.2d at 751 (father accused of sexually abusing his daughter and niece); *Crabtree*, 716 S.W.2d at 926 (child accused the father of sexually abusing him).[6]

---

[6] We acknowledge that Husband correctly points out that the facts in this case bear some similarity to those in *Radebaugh v. Radebaugh*, No. M2005-02727-COA-R3-CV, 2006 WL 3044155 (Tenn. Ct. App. Oct. 26, 2006). In that case, the trial court ordered supervised visitation because the husband had made "racial, ethnic derogatory remarks to and about [the wife] in the presence of the child." *Radebaugh*, 2006 WL 3044155, at *1. On appeal, the *Radebaugh* court reversed after concluding that the evidence preponderated against the trial court's severe restriction of the husband's time with the child. The court found it significant that "[m]uch of the negative testimony regarding [the husband] vis-à-vis his son pertained to inappropriate conduct and language which was directed, for the most part, at [the wife], but in the child's presence." *Id.* at *9. We find the facts of the present case distinguishable from those in *Radebaugh* because the evidence showed that Husband did not merely make the derogatory remarks about Wife in the child's presence. He made the remarks *to the child*, and he did so repeatedly.

- 16 -

We interpret Husband's argument on this issue to be that, because he was not accused of sexually abusing the child, the court could not order supervised visitation. His argument, however, completely disregards caselaw where this Court found supervised visitation appropriate under circumstances that did not include allegations of sexual abuse and that were similar to those in this case. In *Levenhagen v. Levenhagen*, No. M1998-00967-COA-R3-CV, 2000 WL 1292446, at *6 (Tenn. Ct. App. Sept. 14, 2000), the husband attempted to undermine the children's relationship with the wife by "coach[ing] them] to relate stories about their mother's treatment of them." This Court affirmed the trial court's decision ordering the husband's visitation to be supervised, stating as follows:

> In light of the trial court's expressed concerns that the children were the objects of a psychological tug of war between the parents and the findings that Husband had tried to undermine Wife's relationship with the children, we cannot say that the trial court abused its discretion by ordering that Husband's visitation temporarily be supervised.

*Id.* at *7.

In *Spiegel v. Spiegel*, No. 01A01-9607-CH-00294, 1997 WL 44411, at *1 (Tenn. Ct. App. Feb. 5, 1997), the wife "found used condoms, tissue paper, an adult magazine, and pictures of [the child]" in the husband's car. The wife accused the husband of using the child's photographs for self-stimulation. *Id.* He denied the accusation and presented testimony from a psychologist "who had tested [the husband] and said that in his opinion [the husband] was not mentally ill, was not a sexual deviant, and was not a threat to the child." *Id.* Although there was no direct evidence that the husband had used the child for self-stimulation, the trial court ordered supervised visitation for the husband because there was circumstantial evidence that the husband may have used photographs of the child for self-stimulation. *Id.* at *2. On appeal, this Court affirmed the trial court's supervised visitation decision and stressed that "[t]his is an area that addresses itself to the sound discretion of the trial court, and we do not think the legislature intended to remove that discretion by restricting the power to order supervised visitation to cases involving physical abuse or emotional abuse by the non-custodial parent." *Id.* at *3 (citation omitted).

Based on the foregoing caselaw, we conclude that the trial court's decision falls within "the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88. We, therefore, conclude that the trial court did not abuse its discretion in ordering that Husband's visitation be supervised for six months.

D. Failure to maximize parenting time once remedial steps were completed

Lastly, Husband contends that the trial court abused its discretion in limiting his parenting time to ninety days per year once he had completed the six months of supervised

- 17 -

visitation supervised by a licensed mental health professional.  According to Husband, once the supervised visitation is completed, the court's concerns would be addressed, so the court should have ordered that he have "50/50" parenting time with the child upon completion of the six months of supervised visitation.  By not ordering equal visitation at the conclusion of the supervised visitation, Husband claims that the trial court punished him rather than doing what was in the best interest of the child.

Husband correctly points out that "[c]ustody should never be used to punish or reward the parents, but rather should promote children's best interests by placing them in an environment that will best serve their physical and emotional needs." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996) (citations omitted).  In furtherance of this principle, Tenn. Code Ann. § 36-6-106(a) requires a court to "order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child" based on what is in the child's best interest.  And, Tenn. Code Ann. § 36-6-404(b) requires courts to "make residential provisions for each child . . . which encourage each parent to maintain a loving, stable, and nurturing relationship with the child" based on the best interest factors in Tenn. Code Ann. § 36-6-106(a)(1)-(15).

There is no dispute that, during the parties' marriage, Husband was "extremely active" in the child's life and had a good relationship with the child.  After Wife filed the petition for divorce, however, Husband engaged in behavior that was inappropriate and disturbing.  His prior good behavior does not negate the bad behavior he repeatedly engaged in during the course of these proceedings.  As discussed at length earlier in this opinion, this inappropriate and disturbing behavior by Husband served as the trial court's basis for limiting his parenting time pursuant to Tenn. Code Ann. § 36-6-406(d).  And, Tenn. Code Ann. § 36-6-404(b) provides that courts do not have to apply the best interest factors for maximizing parenting time in Tenn. Code Ann. § 36-6-106(a)(1)-(15) "[i]f the limitations of § 36-6-406 are . . . dispositive of the child's residential schedule."  We have found that the record supports the trial court's decision to limit Husband's parenting time pursuant to Tenn. Code Ann. § 36-6-406(d).  Accordingly, the limiting factors in Tenn. Code Ann. § 36-6-406(d) were controlling, and the trial court did not abuse its discretion in not ordering "50/50" parenting time.[7]

---

[7] In the last paragraph of his brief, Husband requested an award of attorney's fees.  His brief, however, fails to identify attorney's fees as an issue, and he provides no argument for why he is entitled to attorney's fees.  Indeed, he fails to inform this Court whether he wants an award of trial attorney's fees or appellate attorney's fees.  We, therefore, deem this issue waived. *See Wheeler v. Wheeler*, No. M2019-01016-COA-R3-CV, 2020 WL 2893435, at \*6 (Tenn. Ct. App. June 3, 2020) (holding that Wife's request for attorney's fees was waived "due to her failure to designate this request as an issue on appeal").

CONCLUSION

The judgment of the trial court is affirmed as modified. Costs of this appeal are assessed against the appellant, Marc N. Duffer, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE